UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ALISTAIR GOODMAN, NICHOLAS          :
GOODMAN, AND JAMES FENNER,          :          CIVIL NO.  3:01CV1609 (GLG)
EXECUTOR OF THE ESTATE OF           :
MARILYN B. FENNER                   :
          Plaintiffs,               :
                                    :
    V.                              :
                                    :
                                    :
TOWN OF FARMINGTON BOARD            :
OF EDUCATION AND KEVIN M. DENEEN    :
          Defendants,               :          APRIL 20, 2004

MEMORANDUM OF LAW IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT

I. Background

Plaintiffs' decedent Dr. Marilyn Fenner was hired by the Farmington Board of

Education in 1992.  She was hired as principal of the West District School.  As a

principal in Farmington, Dr. Fenner was a beneficiary of the Collective Bargaining

Agreement between the Board of Education and the Farmington Administrative and

Supervisor's Association.

Pursuant to the terms of the Collective Bargaining Agreement, the Farmington

Board of Education agreed "to provide administrators with life insurance at an amount

equal to two times the administrator's salary".  During the last year of Dr. Fenner's active

employment with Farmington, July 1, 1999 through June 30, 2000, Farmington paid the

premium for a term life insurance coverage for Dr. Fenner with Sun Life Insurance

Company.  Exhibit C.  The premium paid would have entitled Dr. Fenner's term life

insurance contract beneficiary (sons Alistair Goodman and Nicholas Goodman) to an amount equal to two times the administrator's salary. Collective Bargaining Agreement, Article V § B(a) if Dr. Fenner died while the Sun Life policy was still in force.

Dr. Fenner was diagnosed with a cancerous brain tumor in November, 1999. She ultimately died on December 17, 2000. Amended complaint, First Count, paragraph 6.

Between Thanksgiving and early December, 1999, Dr. Fenner informed Dr. Robert Villanova, Farmington Superintendent of Schools, that she required surgery for a brain tumor. Exhibit E, p. 97. She underwent surgery in December, 1999 and was able to return to work in January, 2000. Exhibit E, pp. 97-98. On February 29, 2000, Dr. Fenner announced to West District school parents "that this will be my last year as Principal of West District School". It appears that she gave the same message to the Farmington school system "faculty" earlier in the day on February 29, 2000. (Letter dated February 29, 2000 signed by Marilyn Fenner and attached as Exhibit E to Defendant's memorandum in support of this motion.)

In February or March of 1999, Dr. Fenner had a meeting with Superintendent Villanova to discuss the terms and conditions of her transition from being principal of West District School to some other status. Exhibit E, pp. 64-65; p. 102. Among the subjects discussed were Dr. Fenner's employee benefits, to wit: "Income, health insurance, life insurance". Exhibit E, pp. 65, 102-103. The meeting with Villanova "was a very brief meeting, nothing was resolved, [Villanova] said any time you want to meet, fine. The problem was not getting Villanova to sit down with us, the problem was coordinating with Deneen". Exhibit E, p. 103.

Dr. Fenner and her husband James Fenner made many unsuccessful attempts to set up a meeting with Attorney Deneen and more especially, to get follow-up advice on what steps if any, Dr. Fenner should take to protect her employment rights. Exhibit E, pp. 102-109. On February 9, 2000, Dr. Fenner and her husband James Fenner had their initial meeting with Attorney Deneen to get legal advice. Exhibit F, pp. 74-75.

At no time did Dr. Fenner ever tell Attorney Deneen that she had in fact resigned or planned to submit her resignation; nor did she relate to Deneen that she had negotiated any sort of change in status with Villanova.

Deneen was advising Dr. Fenner from February 9, 2000 (initial office conference) to a time after July of 2000. Exhibit F, p. 113. As of June 21, 1000, Attorney Deneen believed Dr. Fenner still held the position of administrator in the Farmington school system and that Dr. Fenner had no intention of resigning or retiring effective June 30, 2000. Exhibit F, pp. 100-113. In fact, on June 21, 2000, Attorney Deneen sent a letter of advice to Dr. Fenner which discussed Fenner's rights to vacation and sick leave for the school year beginning July 1, 2000. Exhibit F, p. 100; Exhibit H. Based on what Dr. Fenner disclosed to him during her consultations with him, Deneen did not believe there was any ambiguity with respect to Dr. Fenner's position with the Town of Farmington for the July 1, 2000 to June 30, 2001 school year "because she was a tenured employee and had not submitted her resignation". Exhibit F, p. 123.

On June 22, 2000, Dr. Fenner completed her portion of an application for disability income that was to be submitted to the State Teachers Retirement Board. Exhibit I. The application was then given to Superintendent Villanova who filled in the portion of the application form entitled "Statement from supervisor, principal or peer".

3

Exhibit I. Superintendent Villanova executed his portion of the form on June 26, 2000

and forwarded it as per the directions on the bottom of this form directly to the Teachers

Retirement Board. Neither Dr. Fenner nor her husband, James Fenner, ever saw Dr.

Villanova's statement on the disability application until some time after Dr. Fenner's

death, when counsel probating Dr. Fenner's estate procured this from the Farmington

school system. Exhibit E, pp. 68-70; Exhibit I.

At some time prior to July 2000, the Farmington school system stopped paying a

premium to Sun Life Insurance Company that would have continued term life insurance

coverage for Dr. Fenner into July, 2000. Exhibit C, p. 2. The Farmington school system

never notified Dr. Fenner that it was discontinuing paying the premium necessary to

continue term life insurance on Dr. Fenner's life until some time subsequent to Dr.

Fenner's death in December, 2000. See Exhibit C, p.2.

As the Farmington school system never made Dr. Fenner aware of the fact that it

was planning on discontinuing term life insurance coverage on her life effective July 1,

2000, Dr. Fenner was unable to avail herself of three rights she had under either the Sun

Life policy or under the Collective Bargaining Contract, namely: (1) to request her

employer to continue her life insurance premium payments for up to 12 months as

provided by the policy. See Exhibit G, p. 7; and/or (2) to take advantage of a "conversion

privilege" as provided by the policy. See Exhibit G, p. 8; or (3) to pursue her collective

bargaining right to complain to the Farmington school system that they had made a

mistake in deciding to terminate her term life insurance coverage and, if the error was not

4

corrected in a timely fashion, to grieve this decision through the grievance procedure.[1]

As a result of the lack of notice, Dr. Fenner believed her term life insurance was still in force, at least up through August, 2000. Exhibit E, pp. 100-111. Once counsel learned that Farmington had discontinued premium coverage for Dr. Fenner in June, 2000, he initiated a lawsuit in State court on August 17, 2001. The action was removed to federal court by defendant Farmington Board of Education. On December 11, 2001, a claim against Attorney Kevin Deneen was added. After a stay of the litigation terminated in the beginning of 2004, the defendant filed a motion for summary judgment.

## II. Legal Standard

The party moving for summary judgment has the burden of clearly establishing the lack of any triable issue of fact by the record properly before the court. The movant's papers are carefully scrutinized; and those of the opposing party are on the whole indulgently regarded. *Bishop v. Wood*, 426 U.S. 341, 96 S. Ct. 2074, 48 L. Ed. 2d 684 (1976). For purposes of the motion, the non-movant's version of the facts must be accepted, and all disputed matters must be resolved in his favor; *United States v. Diebold*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) "On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion."

---

[1]     The exact nature and circumstances of the taking of the adverse action in canceling Fenner's coverage must have been inadvertent, as opposed to well thought out and well considered, for the following reasons: as discussed above, no notice was given to Fenner that the adverse action was either contemplated or being effectuated - this despite the fact that Farmington, especially its Superintendent, knew or believed, as Farmington's brief so forcefully states, that Fenner was in no position to provide services for the Farmington school system in the school year beginning July 1, 2000 (and was shortly doomed to die).

The same Farmington decision maker or action taker also should have been very much aware of the existence of two of Fenner's rights under the Sun Life policy: to wit, (a) having the Board of Education continue coverage for her for up to twelve months, and (b) her right of conversion. Both rights are critically dependent upon proper notice for their timely exercise.

To ascribe the alternative thought process to the Farmington adverse action decision maker is only to impute negative intentions which plaintiffs are wont to do.

### III. Law and Argument

**Summary of Plaintiff's Position**

A.    As to plaintiff's Breach of Contract Claim (First Count) defendant is not entitled to summary judgment under any of the three articulated reasons put forth by the defendant.

Re:  claim #1 "that the plaintiffs' decedent was not an employee at the time of her death and therefore … did not enjoy rights under the Collective Bargaining Agreement." This claim is erroneous and irrelevant in that it assumes that the alleged breach of contract occurred by Farmington's doing or not doing something at the time Dr. Fenner died.  The counter statement of facts makes abundantly clear that the claimed malfeasance of Farmington occurred prior to July 1, 2000 in its failing to pay a term life insurance premium to Sun Life continuing the term life insurance upon Marilyn Fenner's life beyond June 30, 2000.  At that time she was unquestionably an employee of Farmington.

Similarly, defendants' claim #2 that Fenner was not actively at work at the time of her death and therefore not entitled to life insurance under the Sun Life policy must fail because the Sun Life policy contains at least two provisions allowing for continuation of the policy that otherwise would terminate;  and, because plaintiff was never notified that Farmington was discontinuing its payment of premium on behalf of Dr. Fenner, plaintiff could not timely avail themselves of these options to continue coverage.

Defendant's third claim – failure to exhaust grievance procedures – is also without merit for the following reasons:

(a)     The grievance procedure that Farmington is relying upon does not contain an expansive arbitration clause and the matter in controversy is outside the scope of the collective bargaining agreement's grievance procedure.

(b)     Even if the matter in controversy were deemed to fall fairly within the scope of the arbitration clause, Farmington is estopped from claiming failure to exhaust this remedy when Farmington failed to notify Dr. Fenner of its action discontinuing payment of premium.  This failure to give notice lasted more than 5 months and it was only subsequent to the death of Dr. Fenner that her estate first became aware of the alleged malfeasance.  Dr. Fenner never knew of the termination of her life insurance while she was alive.

(c)     There is no authorization for an estate representative to prosecute a grievance.  Once Dr. Fenner died without knowledge of Farmington's malfeasance, any grievance procedure requirements terminated.  See *Arsenault v. General Electric Co.*, 147 Conn. 130, 133 (1960) where the Connecticut Supreme Court stated: "The collective bargaining agreement limits the right to arbitrate to the union and the company.  No provision is made for arbitration at the request or demand of an employee.  Without such a provision in the contract, the plaintiffs cannot compel the defendant to arbitrate."

(d)     Resort to the grievance procedure to attempt to rectify the breach of contract would be a futile act.  Reinstatement of premium payment by Farmington would not cure the alleged wrongdoing and provide adequate damages suffered by plaintiffs.

## IV.  Defendants' Exhaustion Claim

**A.     Outside the scope of the grievance procedure**

Article VIII Definition 1. of the Collective Bargaining Agreement states:

"A grievance shall be a complaint by an administrator that there has been a violation, misinterpretation or misapplication of a specific provision of this agreement and shall be subject to the grievance procedure and may be processed to arbitration (Level Four). (emphasis added)

Paragraph C addresses time limits for filing a grievance. The applicable section states:

"If an administrator does not file a grievance in writing within fifteen (15) calendar days after she/he first knew of the act or condition on which the grievance is based, then the grievance shall be considered to have been waived.

The only specific provision of this agreement which is involved in this controversy is Article V Salaries and Benefits more specifically item 8 thereof which states:

"8. The Board will provide administrators with life insurance at an amount equal to two times the administrators' salary."

Noteworthy is the fact that neither this specific provision nor the rest of the collective bargaining agreement contains any verbiage addressing such matters as:

(1)    What obligation if any, is there upon the school board to continue paying for life insurance of an employee who is a tenured administrator who has not retired but who is not capable of performing certain duties at the start of the next calendar year (in this case beginning July 1, 2000)?

(2)    What is required for the school system to determine that an employee has "retired"?

(3)    Assuming there has been an oral declaration or intention to retire, is this sufficient for Farmington to have taken the action at issue?

(4)    Most importantly, the collective bargaining agreement has no provision addressing the issue of notice; i.e. assuming Farmington correctly determined

8

that Dr. Fenner had retired (although that conclusion is strenuously denied) what notice, if any, must be given to the person against whom the adverse action has been taken.

In short, what transpired in the instant matter falls far outside what is contemplated by the language "there has been a violation, misinterpretation or misapplication of a specific provision of this agreement."

Furthermore, the language "when the administrator first knew of the act or condition on which the grievance is based" seems clear enough. The facts in this case demonstrate that Dr. Fenner never knew of the act that she is supposed to grieve. Dr. Fenner never knew that Farmington had stopped paying her term life insurance premium. As a result a condition precedent to the invoking of the grievance procedure is absent.

Finally, the collective bargaining agreement makes no provision for a representative of an estate to initiate a grievance. Indeed, the whole thrust of the grievance procedure appears to be a step or level procedure involving first the grievant and his/her "immediate supervisor". See Article VIII F. Formal Procedure; if that step doesn't dispose of the matter, there is an appeal to the Superintendent; if that fails, then resort is to be had with the Board of Education. Lastly, there is resort to arbitration. Nowhere is there any reference to representatives of an administrator being empowered to pursue a grievance.

Now whether the arbitrability of a dispute is a question for the court or for the arbitrators depends upon the language of the contract *Gary Excavating, Inc. v. North Haven,* 164 Conn. 119, 122 (1972). See also *Wallingford v. Wallingford Policy Union Local 1570,* 45 Conn. App. 432, 436 (1997).

9

Moreover "whether a particular dispute is within the scope of an agreement to arbitrate is a question for the court unless, by appropriate language, the parties have agreed to arbitrate that question also." *Kantrowitz v. Perlman*, 156 Conn. 244, 226 (1968).

As was further stated in *Kantrowitz, supra* at 227:

"Where a contract contains a stipulation that the decision of arbitrators on certain questions shall be a condition precedent to the right of action on the contract itself, such a stipulation will be enforced, and, until arbitration has been pursued, or some sufficient reason is given for not pursuing it, no action can be brought on the contract. *Bernhard v. Rochester German Ins. Co.,* 79 Conn. 388, 395, 65 A. 134; see *First Ecclesiastical Society v. Besse,* 98 Conn. 616, 622, 119 A. 903. Whether an agreement makes arbitration a condition precedent to an action in court depends on the language of the agreement. 5 Am. Jr. 2d 535, Arbitration and Award, §20. In the absence of such express language, a provision for arbitration may be construed to be a condition precedent to suit by implication, but that implication must be so plain that a contrary intention cannot be supposed nor any other inference made. It must be a necessary implication. *First Ecclesiastical Society v. Besse, supra,* 623.

See also *Board of Education v. Frey,* 174 Conn 518, 580 (1978).

It is perfectly clear that in the applicable collective bargaining agreement, there is no express language that arbitration is to be a condition precedent to suit.

## B.    Estoppel of Farmington

As stated earlier, Farmington never notified Dr. Fenner or Dr. Fenner's estate (until months after the term life insurance policy had expired) of the adverse action it was taking. Farmington's failure to give timely notice also implicated certain other rights of Dr. Fenner. e.g. the right to request the Board of Education to voluntarily continue to pay the premium for up to 12 months; and the right (Dr. Fenner's right) to convert the term life insurance to a whole life policy. Additionally, had timely notice been given, Dr.

10

Fenner could have requested the Farmington Board of Education to continue to pay life insurance premiums for up to twelve months starting July 1, 2000.

Yet Farmington claims that because the estate fiduciary (James Fenner) did not file a grievance within 15 days of his learning that there was no life insurance in force, "this court lacks subject matter jurisdiction". Plaintiffs respond that if the instant matter is deemed to be within the scope of the grievance arbitration agreement, Farmington is estopped from claiming failure to exhaust an administrative remedy, by reason of its failure to timely and appropriately notify the potential grievant (Dr. Fenner) of the adverse action it was taking. ". . . administrative exhaustion is subject to waiver, estoppel and equitable tolling." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393 (1982).

As was said in *Kimberly Clark Corp. v. Dubno,* 204 Conn 137 "Under our well established law, any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury."

Clearly these two essential elements are present in the instant case. Farmington led Dr. Fenner to believe no change in the status of her life insurance premium being paid by Farmington was either being contemplated or being effected. Fenner, in reliance of that implied state of affairs, never was able to timely request the Board of Education to continue to pay her term life insurance premiums for up to twelve months; never was able to convert of the term insurance to full life insurance as was her right if exercised in a timely fashion; and never pursued a grievance. There is no question that she has suffered damage and injury as a

11

consequence.  Farmington is thus precluded from claiming lack of subject matter jurisdiction by reason of Fenner's alleged failure to exhaust administrative remedies.

**C.     Futility**

Even assuming all prior arguments concerning the scope of the grievance procedure available to plaintiffs should fail, and assuming plaintiffs' estoppel argument is without merit, nonetheless, the option for plaintiffs to avail themselves of the grievance procedure under the circumstances of this case is and was futile.

As this court should be fully aware, notice of the adverse action taken by Farmington was not given to Dr. Fenner before she died.  Had notice been given to Dr. Fenner before she died, she might have been able to timely file a grievance and pursue through arbitration, a proper and reasonable remedy, e.g. obtain an order requiring Farmington to meet its obligations under Article V, item 8, to wit:  "The Board will provide administrators with life insurance at an amount equal to two times the administrators' salary."

However, once Dr. Fenner had died, she was no longer insurable and there was no proper and reasonable remedy available to her estate through arbitration under the collective bargaining agreement.

The limitations upon an arbitrator under this collective bargaining agreement are clear and simple.  The operable clause (see Exhibit D, p. 22) states:

> "The arbitrator shall hear and decide only one grievance in each case. He/she shall be bound by and must comply with all the terms of this Agreement. <u>He/she shall have no power to add to, delete from, or modify in any way any of the provisions of this Agreement.</u>  (emphasis added).

As a consequence, once Dr. Fenner died without receiving notice, there was no remedy available under the grievance procedure and resort to it would have been futile.

See the case of *Mendello v. Board of Education*, 246 Conn. 456 (1998) where for example the Connecticut Supreme Court decided that requiring a complainant to resort to the administrative process was demonstrably futile or inadequate where the dispute was "whether she resigned voluntarily or was forced to do so by the wrongful conduct of Thompson. That kind of factual dispute simply does not fit within either the purpose or the language of § 10-151(d)". *Mendello*, supra at p. 469. Or consider *Frank v. Department of Parks & Rec of Greenwich*, 78 Conn. App. 601 (2003) where the remedy under the collective bargaining Agreement was deemed inadequate because the arbitrator had no authority to grant the worker more than 35 hours credit. Interestingly enough, in the Frank case, the collective bargaining agreement provided exactly the same standard as in the instant case, to wit: "arbitrators shall have no power to add to, subtract from or in any way change or modify any of the provisions of [the collective bargaining] Agreement …" *Frank*, supra at p. 608.

See also such cases as *Brackett v. St. Mary Hospital*, 1998 Conn. Super Lexis 3174; *Beauregard v. City of Norwich*, 1998 Conn. Super Lexis 2336; *Labbe v. Pension Commisison*, 229 Conn. 801, 812 (1994) where futility rendered the exhaustion of administrative remedy principle a nullity.

**D.     The Defendant is not entitled to Summary Judgment on plaintiffs' claim of Disability Discrimination in violation of the Connecticut Fair Employment Practices Act 46a-60(a)(1).**

Farmington has advanced two arguments in support of its position. They are: (1) failure to exhaust available administrative remedies and (2) inability to establish discrimination as a matter of law. Both of Farmington's claims are without merit.

**(1)     Exhaustion**

13

As Farmington itself has acknowledged,

"The Connecticut courts generally look for federal employment discrimination law for guidance in enforcing its own anti-discrimination statute. See Craine v. Trinity College, 259 Conn 625, fn. 6 (2002); Levy v. Commission on Human Rights and Opportunities, 236 Conn 96, 103 (1996); State v. Commission on Human Rights and Opportunities, 211 Conn. 464, 469-70 (1989). As with claims under Title VII, a claim of discrimination under the Connecticut Fair Employment Practices Act is also analyzed under the *McDonnell-Douglas* burden-shifting paradigm. See Ann Howard's Apricots Restaurant v. CHRO, 237 Conn. 209, 225 (1996); United Technologies Corp. v. CHRO, 72 Conn. App. 212, 221 (2002)."

The U. S. Supreme Court in *Zipes et al v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, in a case involving alleged sex discrimination in violation of Title VII of the Civil Rights Act of 1964 stated as follows: "We hold that filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel and equitable tolling."

Plaintiffs contend that the very same claim of estoppel that was articulated in Part I of this memorandum with respect to the contract cause of action (and Farmington's claim that plaintiffs failed to exhaust an administrative remedy) is applicable here with regard to the claim of disability discrimination. In short, by reason of Farmington's failure to give Fenner notice of its taking adverse action with respect to continuation of its paying her term life insurance premium, Farmington is estopped from claiming Fenner must exhaust any administrative complaint procedure. Fenner is now deceased and imposing such a requirement on her estate is unreasonable, impracticable and futile. See supra for legal authority re: estoppel.

**(2)    A prima facie case of disability discrimination has been alleged:**

14

"To establish a *prima facie* case of discrimination, the plaintiffs must show that: (1) the decedent had a disability as defined under the CFEPA; (2) she was qualified to perform the essential functions of her job with or without reasonable accommodation; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances given rise to an inference of discrimination on account of her disability.  See Reeves v. Johnston Controls World Svs., 140 F. 3d 144, 149-50 (2nd Cir. 1998); Ann Howard's, 237 Conn. At 225."

It is perfectly clear that as of the time that Farmington took adverse action against Dr. Fenner (ie. at some time immediately prior to July 1, 2000 – at which point premiums were no longer paid to Sun Life) (1) Fenner had a disability as defined under CFEPA; (2) she was in fact performing the essential functions of her job; (3) she suffered an adverse employment action (of which she, of course, was not aware) and (4) it occurred under circumstances that give rise to an inference of discrimination on account of her disability.  In no sense can it be said that plaintiffs have not made a prima facie case of disability discrimination under CFEPA.

### (3)   Defendant Farmington is not entitled to Summary Judgment under plaintiffs' Third Count alleging a violation of the Family Medical Leave Act.

Farmington advances three specific arguments addressed to plaintiff's Third Count. We shall take them up in order.

First, Farmington argues that "decedent never provided the Board with adequate notice of her intent to request family medical leave." The facts of this case strongly dictate to the contrary.  As is abundantly clear from Exhibits I, J and K, Fenner, with the explicit assistance of Villanova, applied for and received a disability allowance from the Teachers Retirement Board.  The medical nature of the leave is apparent on the face of the application -  the beginning date of the leave was to be July 1, 2000 (Exhibit K). As with most serious medical conditions, no one knew how long the actual illness or

disability would last, only that it was extremely serious and extremely disabling. To argue that the Board wasn't on notice within the meaning of 29 USC 2612(e)(2)(B) is sophistry. See *Rodney Michele v. Eyelets for Industry, Inc. et al*, 220201 Conn. Super. Lexis 1937, wherein the court stated: "An employee seeking leave under the FMLA need not specifically invoke his rights under FMLA . . . to sufficiently request leave under the FMLA, an employee need only provide the employer with enough information to put the employer on  notice that FMLA-qualifying leave is needed."

Farmington next claims plaintiffs' Third Count must fail "because the decedent was not an 'eligible employee'" and further claims Fenner was not an eligible employee because she "resigned her position as principal effective June 30, 2000." This, of course, is inaccurate and untrue and begs one ultimate question.  It is inaccurate in the sense that it attempts to transform Fenner's statement to faculty and parents of students that the school year ending June 30, 2000 "will be her last year as principal of West District School" to a statement that she was resigning; it is untrue in the sense that it implies that Dr. Fenner ever submitted a resignation or stated she was resigning; and it begs the question of did Dr. Fenner ever orally or in writing resign from the Farmington system. To assert this claim as a basis for a summary judgment in light of the counter statement of facts is meritless.

Lastly, Farmington argues that even if Fenner had been afforded leave under FMLA, "that leave would have expired after twelve weeks" and that "she would have had no leave remaining as of December 15, 2000." This argument is irrelevant and completely misunderstands what actionable time frame applies to the Third Count.

The disability application made to the Teachers Retirement Board was dated June 22, 2000 by Dr. Fenner; the endorsement statement by Supt. Villanova was added on June 26, 2000 and the grant of disability was approved by the Teachers Retirement Board on July 27, 2000, to be effective as of July 1, 2000. Using any one of these dates, there is a disability leave period of twelve weeks that would extend the benefits protection afforded by the FMLA well into September, 2000.

Yet it was <u>on</u> or <u>prior</u> to July 1, 2000 that adverse action was taken by Farmington with respect to Fenner's term life insurance. Without question, Fenner had been given term life insurance protection up through June 30, 2000. Equally clear is the fact that effective July 1, 2000 Fenner no longer had term life insurance coverage. The change in benefit status occurred on July 1, 2000 which was well within the twelve week benefit protection window afforded by FMLA.

### V. Conclusion

The Court should deny summary judgment with respect to all the contested counts of plaintiff's complaint.

PLAINTIFFS,

By _____
    David B. Beizer, Esq. / No ct06161
    Beizer & Weintraub
    345 North Main Street
    West Hartford, CT 06117
    Their Attorneys

## CERTIFICATION

This is to certify that on April _20_, 2004, a copy of the foregoing was mailed,

postage prepaid, to the following counsel of record:

       Louis B. Blumenfeld, Esquire
       Cooney, Scully and Dowling
       Hartford Square North
       Ten Columbus Boulevard
       Hartford, Connecticut 06106

       Michael J. Rose, Esquire
       Howd & Ludorf
       65 Wethersfield Avenue
       Hartford, Connecticut 06114-1190

       Alexandria L. Voccio, Esquire
       Howd & Ludorf
       65 Wethersfield Avenue
       Hartford, Connecticut 06114-1190

                       David B. Beizer