UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ALISTAIR GOODMAN, NICHOLAS
GOODMAN, AND JAMES FENNER,
EXECUTOR OF THE ESTATE OF : CIVIL NO. 3:01CV1609 (GLG)
MARILYN B. FENNER
     Plaintiffs,

V.

TOWN OF FARMINGTON BOARD
OF EDUCATION AND KEVIN M. DENEEN
     Defendants,              :     APRIL 20, 2004

## LOCAL RULE 56(a)2 STATEMENT

I.    Pursuant to Local Rule 56(a)2, the plaintiffs hereby respond to the defendant Town of Farmington Board of Education's claim of "uncontested facts".

1. Admitted

2. Admitted

3. Admitted

4. Denied. The collective bargaining agreement sets forth a grievance procedure to administrators who believe "there has been a violation, misinterpretation or misapplication of a specific provision of this agreement" (emphasis added). See Exhibit D, page 19.

5. Admitted

6. Admitted as to what is stated, but denied to the extent that there are qualifications to the cessation of the insurance. See the "issue of material fact" section of this pleading.

7. Admitted

8. Admitted

9. Admitted

10. Admitted

11. Admitted

12. Admitted

13. Admitted

14. Admitted

15. Admitted

16. The allegations of paragraph 16 are admitted, except for the last sentence thereof which reads as follows: "Dr. Fenner informed the faculty of her June 30, 2000 retirement and her intent to continue as principal from now through the end of the year" (emphasis added), which assertion is denied.

17. Denied.  As Dr. Fenner had never "retired", Dr. Villanova could not be said to have "confirmed [her] retirement".

18. Admitted except for the implication that must arise that because Amy Barret used the word "retirement" in a letter to Dr. Fenner, that in fact Dr. Fenner had retired, which is denied.

19. Admitted

20. Admitted that the superintendent wrote what defendant claims but it is expressly denied that Dr. Fenner ever submitted an intent to retire letter or ever articulated an intent to retire on or about June 30, 2000.

21. Admitted

22. Admitted

23. Admitted

24. Denied. As stated, this assertion is inaccurate and misleading. It should be corrected to read: "The remainder of the health insurance premium was paid by the Connecticut Teachers' Retirement Board." See Exhibit B, pp. 44-45.

25. Admitted

26. Admitted

27. Admitted

28. Denied. During her widower's deposition, he was not asked, nor was there any independent inquiry as to whether on or about July 1, 2000 Dr. Fenner was or was not performing any job duties.

29. Admitted

30. Denied

31. Admitted

32. Admitted

33. Denied. Dr. Fenner had met once with Superintendent Villanova in April 2000 to discuss her future job situation (Exhibit E pp. 64-65; p. 102) and her future job status was left open to be discussed again with the Superintendent after Dr. Fenner had had an opportunity to meet with Attorney Kevin Deneen.

34. Admitted

35. Admitted

36. Admitted

37. Admitted

38. Admitted

3

**II.** List of Issues of material fact that require trial.

1. Whether Dr. Fenner ever submitted any writing or other document to the Farmington Board of Education that demonstrates that she had retired or resigned.

2. Whether Dr. Fenner ever orally stated to Dr. Villanova that she was resigning, Exhibit F (Fenner Deposition, pp. 28-29; pp.36-37, p.40).

3. Did Dr. Fenner in fact ever resign prior to her death in December 2000?

4. Did the Farmington Board of Education or any of its agents take any action adverse to the continuation of Dr. Fenner's term life insurance prior to the conclusion of the July 1, 1999 through June 30, 2000 Farmington school year? (See Exhibits A and C.)

5. If Farmington Board of Education did take adverse action prior to July 1, 2000 what action did it take and when did it take that action? (See Exhibit C.)

6. If Farmington school system's agents did take adverse action relative to Dr. Fenner's term life insurance benefits at any time, did Farmington timely notify Dr. Fenner of the steps it was taking to terminate or effect her term life insurance coverage? (See Exhibit C; also Exhibit F, pp. 108 and 131.)

7. When did <u>Dr. Fenner</u> or <u>her estate</u>, as the case may be, first learn that Farmington had notified Sun Life prior to July 1, 2000 that Dr. Fenner was not to be considered an insured under its term life policy effective July 1, 2000?

8. Does the grievance procedure under the applicable Collective Bargaining Agreement apply at any time, to a situation where a grievant might use it to correct a decision of the Farmington School Board which has notified a third party, in this case, Sun Life, that it was removing a previously covered administrator from future term life insurance coverage?

4

9. Does the grievance procedure under the applicable collective bargaining agreement apply <u>after the death</u> of a former insured to correct a decision made six (6) months prior thereto by the Farmington school board in notifying a third party that Farmington was terminating an administrator's term life insurance coverage?

10. Even if the grievance procedure referenced above in issues #9 and #10 were deemed to apply, and a grievance had in fact been timely filed, did the grievance procedure contain a remedy allowing reinstatement of the Sun Life insurance policy?

### III. Counter Statement of Material Facts

In addition to those facts asserted by defendant Farmington Board of Education in its 56(a)1 Statement, which plaintiff has admitted, plaintiff asserts that the following facts are material.

1. Dr. Fenner never intended to retire from the Farmington School System. (Exhibits E and F.)

2. In March of 1999, Dr. Fenner had a meeting with Superintendent Villanova to discuss the terms and conditions of her transition from being principal of West District School to some other status (Exhibit E, pp. 64-65, 102).

3. Dr. Fenner discussed with Superintendent Villanova that she wanted to continue her life insurance benefits with the Farmington school board (Exhibit E, p. 65).

4. Dr. Fenner advised Superintendent Villanova in March of 1999 that she wanted to pursue this subject with him as well as other terms and conditions of her transition from being principal after arranging a meeting with Attorney Kevin Deneen (Exhibit E, pp. 65, 102-103).

5. Dr. Fenner and her husband James Fenner made many unsuccessful attempts to set up a meeting with Attorney Deneen to get advice on what steps, if any, Dr. Fenner should take to protect her employment rights (Exhibit E, pp. 102-103).

6. James Fenner spoke with Superintendent Villanova on another occasion during which occasion Villanova reiterated his willingness to sit down with Dr. and Mr. Fenner and Attorney Deneen to discuss Dr. Fenner's "benefits" (Exhibit E, p. 104)

7. A copy of Dr. Villanova's statement made on Dr. Fenner's application to the Teachers' Retirement Board disability benefits that read "Dr. Fenner submitted her intent to retire letter in April 2000 and will retire from her position as West District School Principal on June 30, 2000" (see <u>defendant's</u> Exhibit I) was not seen by Dr. Fenner prior to its submission to the Teachers' Retirement Board and first came to James Fenner's attention long after Dr. Fenner had died. (Exhibit E, pp. 68-70.)

8. The wording of the letter Dr. Fenner addressed to the parents of West District School was discussed beforehand by Dr. Fenner with her husband James Fenner and Dr. Fenner had, at the time she executed said letter, made a conscious choice "not to retire" (Exhibit E, pp. 77-79, 100-101).

9. As of June 30, 2000 Dr. Fenner felt that she was "on a leave" (Exhibit E, p. 80).

10. Dr. Fenner and her husband James Fenner had a meeting with Attorney Kevin Deneen to discuss Marilyn Fenner's job benefits (Exhibit E, p. 87; Exhibit F, multiple pages). Attorney Deneen responded in part by giving advice to Dr. Fenner in a letter dated June 21, 2000 (Exhibit E, p. 87; Exhibit F p. 52).

11. James Fenner did not know that Dr. Fenner's life insurance was cancelled until after she had died (Exhibit E, pp. 108, 131).

6

12. Dr. Fenner believed her term life insurance was still in force at least up through August 2000 (Exhibit E, pp. 110-111).

13. Attorney Kevin Deneen is a Connecticut attorney specializing in collective bargaining negotiations and administration of collective bargaining contracts including such matters as grievances, etc. (Exhibit F, pp. 8-9).

14. Attorney Deneen represented the Farmington administrators continuously from the early 1990's to the present time (Exhibit F, p. 15).

15. Attorney Deneen was familiar with the terms and conditions of the Farmington administrators' collective bargaining contract at issue in the present litigation (Exhibit F, pp. 16-17).

16. In particular he had been involved previously with enhancing or protecting administrators' benefits, especially health benefits (Exhibit F, pp. 19-21) and had previously participated in the grievance process (Exhibit F, p. 30).

17. Deneen had previously dealt with issues involving term life insurance (Exhibit F, pp. 22-25) and was generally aware that term life insurance was a benefit available to Farmington administrators (Exhibit F, p. 26).

18. Attorney Deneen had a meeting on February 9, 2000 with James Fenner and Dr. Fenner (Exhibit F, p. 25) to advise Dr. Fenner about protecting her benefits as he was told that she had contracted a malignant brain tumor (Exhibit F, pp. 66-67) and was aware that Dr. Fenner had planned a follow up meeting with Dr. Villanova "to try to discuss other options" (Exhibit F, p. 122).

19. In the course of advising Dr. Fenner, Attorney Deneen not only had a meeting with Dr. Fenner on February 9, 2000, but a phone conference with Dr. Fenner on

7

June 19, 2000 (Exhibit F, p. 52), as well as sending an advice letter to Dr. Fenner on June 21, 2000 (Exhibit F, p. 52).

20. He also attempted to speak to Dr. Villanova, Farmington Superintendent, about Dr. Fenner on June 21, 2000 (Exhibit F, pp. 52-53).

21. The meeting between Attorney Deneen and Mr. and Dr. Fenner on February 9, 2000 lasted .8 of an hour (Exhibit F, p. 58).

22. During that February 9, 2000 meeting, Dr. Fenner related to Attorney Deneen "that she had a brain tumor; would not be able to continue working and was trying to decide what to do" (Exhibit F, p. 66) and that she, Dr. Fenner, had shared these thoughts with Supt. Villanova (Exhibit F, p. 67, p. 104).

23. During this February 9, 2000 meeting there was discussion between Deneen and plaintiff (Dr. Fenner) about options available to Dr. Fenner (Exhibit F, pp. 74-75).

24. Among the conclusions reached by Attorney Deneen with respect to options available to Dr. Fenner was that Dr. Fenner was better off "on a disability allowance than the LTD" (long term disability) (Exhibit F, pp. 88-89).

25. During a phone conversation that Deneen had with Mr. Fenner at some point subsequent to February 9, 2000, Mr. Fenner reported to Deneen that he believed Farmington School System had "terminated" Dr. Fenner (Exhibit F, pp. 91-94).

26. Deneen clearly advised Dr. Fenner that she couldn't have been terminated (Exhibit F, pp. 94-95).

27. During the February 9, 2000 attorney-client conference Dr. Fenner never told Deneen that she had submitted her resignation to Farmington (Exhibit F, p. 103).

28. Nor during any subsequent conversation with Deneen did Dr. Fenner ever tell Deneen that she submitted her resignation; nor did she relate to Deneen that "she had negotiated any sort of change in status with him [Supt. Villanova], or anything else" (Exhibit F, p. 104).

29. At no time while Deneen was advising Dr. Fenner was he aware that Dr. Fenner had at any time tendered a resignation (Exhibit F, pp. 108-109).

30. The period of time during which Deneen was "advising" Dr. Fenner ran from February 9, 2000 (initial office conference) to at least some time in July of 2000 (Exhibit F, p. 113).

31. Deneen actually recalls a phone call from Mr. Fenner to him about Dr. Fenner much later than July of 2000 (Exhibit F, p. 113).

32. Dr. Fenner was consulting with Deneen because she was looking for some advice from the attorney as to what her options were (Exhibit F, p. 106).

33. Deneen's letter of advice to Dr. Fenner dated June 21, 2000 discussed Fenner's rights to vacation and sick leave for the school year beginning July 1, 2000 (Exhibit F, p. 110).

34. As of June 21, 2000, Deneen believed Fenner still held the position of administrator in the Farmington School System and that Dr. Fenner had no intention of resigning or retiring effective June 30, 2000 (Exhibit F, pp. 110, 113)

35. Deneen did not believe there was any ambiguity with respect to Dr. Fenner's position with the Town of Farmington for the <u>July 1, 2000 – June 30, 2001 school year</u> because she was a tenured employee and had not submitted her resignation (Exhibit F, p. 123).

36. At some time prior to July, 2000, the Farmington School System stopped paying a premium to Sun Life insurance company that would continue term life insurance coverage for Dr. Fenner into July, 2000. (Exhibit C, p. 2.)

37. The Farmington school system never specifically notified Dr. Fenner that it was discontinuing paying the premium necessary to continue term life insurance on Dr. Fenner's life until some time subsequent to her death in December, 2000. (Exhibit C, p. 2.)

38. The Sun Life term life insurance policy contains various provisions permitting continuation of life insurance after an Administrator ceases to be "actively at work"; more specifically, the Sun Life policy provides "if you are absent from work due to an injury or sickness, your Employer may continue your life insurance by paying the required premium for up to 12 months". (Exhibit G, p. 7.)

39. The Sun Life term life insurance policy further provides for a "conversion privilege". (Exhibit G, p. 8.)

PLAINTIFFS

By /s/ David B. Beizer
David B. Beizer, Esq. (ct06161)
Beizer & Weintraub
Their Attorneys
345 North Main Street
West Hartford, CT 06117
(860) 236-5491


<u>CERTIFICATION</u>

This is to certify that a copy of the foregoing was sent this 20th day of April, 2004, via first class mail, postage prepaid, to:

Louis B. Blumenfeld, Esquire
Cooney, Scully and Dowling
Hartford Square North
Ten Columbus Boulevard
Hartford, Connecticut 06106

Michael J. Rose, Esquire
Howd & Ludorf
65 Wethersfield Avenue
Hartford, Connecticut 06114-1190

Alexandria L. Voccio, Esquire
Howd & Ludorf
65 Wethersfield Avenue
Hartford, Connecticut 06114-1190

*David B. Beizer*
David B. Beizer
Commissioner of Superior Court